Welcome to the First Division of the First District Appellate Court of Illinois. We are here today to hear oral arguments in the case of Browning v. Advocate Health & Hospital Corporation, Case 1-22-1430. My name is Terry Lavin. I'll be presiding today along with my colleague, Terry Lavin. We're looking for 15 minutes or so from each party. The appellant should save some time for rebuttal. We are quite familiar with the record, took some reading, quite frankly, and with the briefs. So why don't we go ahead and hear from the appellant. Thank you, Your Honor, and good afternoon, Your Honors. It may please the court. My name is Tim Eaton, and I represent the advocate entities and Dr. Resnick, who are the defendants in this matter. If you will permit me, I would like to set the stage for what I think is the primary issue in this case, and then I'll be happy to discuss it and field any questions you may have. In this matter, the treaters of Joe Browning's testimony was critical, and how it was presented became a key consideration as to whether Advocate and Resnick received a fair trial. I say this because the defense advocates, Dr. Resnick, presented five highly qualified defense experts that said Advocate and Dr. Resnick met the standard of care. Plaintiff also presented two experts who said that they did not meet the standard of care, but between the two, they couldn't even agree as to what caused the plaintiff's injury or when it occurred. So the treaters' testimony in this case, in our opinion, is critical. The case started, the case liability case, with the reading of excerpts from 10 discovery depositions of Advocate physicians, six of whom were independent contractors at the time they gave their deposition, discovery deposition. These six independent contractors who treated the plaintiff and Advocate three or four years before their discovery depositions were taken were represented by their own counsel, not Advocates. There was no cross or rehabilitation following plaintiff's questions at the deposition, largely because this is a discovery deposition, and as to several of the Advocate physicians, it was obvious that they had not been prepared for the deposition because, at least in one instance, they didn't even know the plaintiff's name and none of them had reviewed their records, maybe some notes, which fed right into the plaintiff's been careful and attentive to the plaintiff when he was hospitalized in 2015. In our opinion, this lack of meaningful representation or preparation for these discovery depositions was apparent, but they were discovery depositions that are not admissible at trial generally. Discovery depositions are only admissible into evidence under very narrow exceptions. One of these exceptions is a statement by an agent of a party during the existence of an agency relationship. Mr. Eaton, I think we lost one of our justices there. Thank you, Judge. You may want to go back about 45 seconds because I think... Yeah, just go ahead and start over. Fair enough. You're going to highlight one issue and then discuss it? Yes, yes, Your Honor. So, the issue, the context, and I'm not sure where I lost you, but I was stating that the treater's testimony was critical and how it was presented was key, and that that was because the experts, there were five qualified defense experts on Advocate and Dr. Resnick's side who thought they met the standard of care, exceeded it, and on the other hand, two plaintiff's experts who could not even agree on what caused the plaintiff's injury or when it occurred. Thus, what the treaters had to say was important. Plaintiff's liability case began with reading excerpts from 10 discovery depositions of Advocate physicians, six of whom were independent contractors at the time they gave the discovery deposition. They gave their discovery deposition three or four years after their treatment of plaintiff, and it was obvious that they had not been prepared because they, in some instances, couldn't even remember his name, let alone the medical records. There was no cross or rehabilitation following plaintiff's questions at the deposition, and they were represented by their own counsel. This lack of meaningful representation of preparation for these discovery depositions was apparent, but they were discovery depositions that are generally not admissible. Discovery depositions are only admissible to very narrow exceptions, one of which is 212A2, a statement by an agent of the party when the statement is made during the existence... Hold on, we lost Justice Lavin again. Oh, I'm sorry. I don't think he did anything that caused it. You don't need to say you're sorry. Okay. I kept talking and I didn't see his picture. That's what happens on Zoom. But this time we caught it right away, so... Hold on, Justice Hyman, Justice Patenski. Sure, no problem. Give us a minute, please. Okay, right. I'm trying it on my cell phone, but go ahead. Okay, thank you, Justice. I'm not sure where you cut out, but let me... The point I was making was that discovery depositions are only admissible into evidence under very narrow exceptions, and one of the exceptions under 212A2 is when a statement of an agent of a party during the existence of that agency relationship is in play. But 801D2D requires that it be admissible as non-hearsay. It must be made by the party's agent concerning a matter within the scope of the agency and made during the existence of that agency relationship. And here, there was no agency relationship between the advocate and these six independent contractors at the time the discovery depositions were taken. There never was a ruling, as a matter of fact, that any of the six independent contractors were apparent agents. They were found to be apparent agents in three years. In late 2019, the discovery debt was taken earlier in 2018, and the sanction that was imposed as the apparent agency by Judge Donley was imposed in late 2020, and their discovery depositions were taken in early 2019. So at the time of their discovery depositions, they did not have an existing relationship which would qualify under 801D2D. And in both the admission and the sanction that Judge Donley entered, the apparent agency was only to relate to their conduct as alleged in the time period in the Third Amendment complaint, which by plaintiff's is retroactively apply the finding of the apparent agency made in 2019 and 2020 to the time they took the deposition. There's no such case law that were permitted. Isn't that what the trial judge, Judge Kirby, isn't that what he, it was his ruling, wasn't it? Yes. No, you're right, Your Honor. It was plaintiff's argument and the judge agreed with it. And so he determined that he could retroactively apply their apparent agency found later to the time that they gave their depositions. But of course, at the time they gave their depositions, they didn't know that somehow later they may be found to be apparent agents. And I don't think anyone could have foreseen there's no case law that interprets that statute that way. No, but you, okay, I agree. So the issue is whether the sanctions order of Judge Donley was correctly interpreted by Judge Kirby, because you're saying that it's a much narrower sanction, if I understand you correctly, than what Judge Kirby ruled. Is that correct? It is. And if you look at the, and it's in the record, the summary judgment that was entered by Judge Donley, what he's talking about is the fact that the apparent agency is based upon what's in the third amended complaint and the conduct in the is much narrower than what Judge Kirby found. Judge Kirby also, which honestly, I don't quite follow it, but he said, not only could it be applied retroactively, even though they sat for the deposition three or four years after their treatment. And there's no question in the record that any of these six people had anything to do with the plaintiff after he left Africa, the six independent contractors. But the other issue that it relates to is whether or not at the time they could foresee that somehow this would be applied retroactively and they should consult with advocate counsel, they should be prepared by advocate counsel, they should be concerned about statements they were made would be attributed to advocate. None of that. I don't know if that's really what's going on as opposed to the fact that as a matter of, first of all, let me just clarify the issues you present for review, neither of them have to do with the sanctions nor the summary judgment, partial summary judgment, correct? Correct. We're not contesting. Right. Correct. So, but with regard to the sanctions, I think the issue is whether Judge Kirby's retroactive effect goes beyond the scope of the actual sanction that was imposed by Judge Donnelly. And Judge Kirby said it doesn't make any sense not to have it applied retroactively. Could you address that statement by the judge? Why you say that even though whether there's case law on it or not, maybe it's a question of first impression, but why that shouldn't be? In Judge Donnelly's ruling on summary judgment, which is dated January 7th, 2021, he said that the doctors, which he lists, were apparent agents of advocate during the time period described in the third amended complaint. And the time period described in the third amended complaint is February of 2015 to April of 2015 when he was discharged and went to the University of Illinois. So Judge Kirby's interpretation of the summary judgment order doesn't make sense. He extends it beyond the time period described in the third amended complaint. And one other reason he stated, Justice Hyman, was that he said, well, there was a claim for future medical or future pain and suffering. So that would extend the time on out. Well, then that would mean they were apparent agents up until the time of the plaintiff's death, which I think is nonsense. But the order that was entered said it's described in the third amended complaint. And I might add, that's the same thing with respect to the admission of Dr. Stone and Dr. Sitzenberg. There was only a one line order from the judge in that case when he granted the amendment. And it was based upon the plaintiff's motion. And the plaintiff's motion said this case arises from care and treatment received from February 10th, 2015 through April 17th, 2015 at the hospital. And then he attaches them in the complaint. So in both summary judgments, it was confined to the time that he was dead advocate. And there's no dispute in this case that any of these independent contractors treated him after April, 2015. Let me just ask you this. It was mentioned by my colleague that this could be a question of first impression. I tried medical malpractice cases for 27 years. I've been on the bench for 14 years, you know, reviewing cases and following cases. I have never seen a single case that was tried like this with cut and paste use of discovery depositions by actors, delivered by actors. And then the defense has no chance to cross examine these people until their case in chief. How was the defense, sum up how the defense in your judgment was prejudiced by the, you know, mockery of a form of a trial that was delivered in this case? First of all, your honor, I agree with your observations. I haven't, I have not like you been a trial lawyer, but I have followed the law for probably as many years as you, and I've never seen a case similar to this because at the time they gave the deposition, they were not prepared. Some of the answers they gave were incomplete, but they were represented by different counsel from advocate, and there was a lack of immediacy at the trial in any ability to cross examine a rehabilitative at that time. It was two weeks later. This case lasted a month, and some of these independent contractors testified on day two, and then almost a month later, the jury gets the case. So I think it's important to keep that in mind in how this was all presented, and I think there definitely was a tremendous amount of prejudice, and I think the other thing... What do you mean by... I mean, we're talking about prejudice. Yes. And tremendous amount of prejudice doesn't really, you know, that's a conclusion. With regard to that prejudice though, all but one of these individuals, as I understand it, did testify for the defense, so there was an opportunity to examine them any way that the defendant wanted to. So this isn't a case where they weren't at all appeared before the jury. They had an opportunity to say anything that they wanted to with regard to the testimony that had been read, didn't they? They did approximately two and a half weeks later. So two and a half weeks later, still with... Where does it say? There's no rule that says that trials need to be done consecutively, and there are, as you know, many trials last quite a long time, and for whatever reason in Cook County, this is a situation that crops up from time to time that jurors are excused for a period of time, and the trial resumes. So you're not hanging your hat on just the fact that this was recessed and then recalled? Is that the correct of your argument? No, no, no. I'm not suggesting that because this was a longer trial, that somehow that makes a difference, but there was a long period of time before they could actually have their testimony clarified. And what should have happened, if this court finds, as I would hope it would, that there was no basis to call them and use their discovery deposition because there was no existing relationship, and then we're dealing with the issue of prejudice. With discovery depositions, they have limited admissibility because there are usually no objections made, there's no preparation made, it's more informal, and as we discussed in our brief, when we're talking about cross-examination, one of the beauties of cross-examination is it's usually done at the time that the direct examination is given, while it's fresh in the mind of the jury. Instead of two and a half weeks later, remember what Dr. Klein said before, let's... I understand that argument, but that does not go to the prejudice. It absolutely does. You think that goes... You cite only two cases on prejudice, is that correct? You cite a case from 1913? No, your honor, I think what we did was we cited a number of cases that deal with the failure to have cross-examination immediately following direct testimony, and there were several cases that dealt with that, and then we just laid out the facts in this case. What about the case Adams? It was one case from the Supreme Court of Wisconsin? Yes, with respect to cross-examination and not being able to have it immediately afterwards. Your honor, I think though what I want to say, and I think I agree with some of this usually happens, if the plaintiff wanted to get the information from these particular treating physicians, what he should have done is called them as adverse witnesses, which he was allowed to do in 1102 in his case in chief, but then we would have been able to cross-examine and rehabilitate them immediately as to what they said, and then if we wanted to call them later in the case, we could. That didn't happen, so the fact that they were allowed to have discovery depths entered into the record, and discovery depths, the Supreme Court in 212 has been very reluctant to have them used, because what's going to happen is that if discovery depths are going to become more easily admissible into evidence, then lawyers are going to prepare for those discovery depths differently. They're not going to be informal, they're not going to be trying to discover things. You're going to have to prepare the witness, you're going to have them review documents, you're going to have to go through what would normally... That's not necessarily true, because not in every case you have the sanction order, and let's say for purpose of argument, we agree that the judge was wrong, and those discovery depositions should not have been presented in that manner, okay? Yes. Now the issue is the one you were discussing, which I think goes to the crux of this case. This case is going to turn on prejudice, so it burdens on you, correct? Yes. Okay, so where in your brief do you argue that the outcome would have been different had the discovery depositions not been admitted? What we say in our brief is that at the time that they were called, many of the individual treating physicians did not remember what was in the medical records, should have not been prepared, which... Oh no, you're talking about the depositions. I understand that. I've already said the depositions should not have been presented at trial, okay? The discovery deposition not have been presented. Right. How then was a trial in your brief, where do you would have been different had the discovery depositions not been read? What we argued in our briefs is that, number one, because these discovery depositions came in with people that were not prepared, it fed into the plaintiff's theory of liability that while he was an advocate, we were not attentive to his care and treatment, number one. Number two, we were prejudiced because in some instances, there were impressions made during the discovery depth as to incomplete information that we weren't able to remedy before this jury for two and a half weeks later. And there was a lot... You were able to remedy it. So you're saying that you were able to remedy it, but it was just two and a half weeks later. Well, your honor, I don't find that a very long time. I find that it was just two and a half weeks later. If the jury would remember the context of what Dr. Klein had said, Dr. O'Day had said, and then we put them on, we were able to get their credentials at that time. We were able to get them to testify, or they did testify that they met the standard of care, all of which would have occurred immediately after their testimony if they'd been called as adverse witnesses. Okay. I just want to ask this question. Yeah, sure. So the discovery depositions were in at point A, and two weeks later at point B, closer to the time that the jury goes into the jury room to decide what's going to happen, you have a chance to actually have those same doctors on the stand. You have a chance to look at those discovery deposition parts that were read to the jury, and you have a chance to ask the doctor about those parts and anything else you want to ask about. So you're closer in time to when the jury is making its decision, and it's your ball. You've got the ball now. What is wrong with that? What's wrong with it, Your Honor, is that despite instructions to the contrary, in my experience in talking to trial lawyers and to observing trials, jurors often make up their mind before they deliberate if they're told not to. And so two weeks earlier, when they're given all this incomplete information as to what advocate did or didn't do or what Dr. Resnick did or didn't do, it's creating an impression. It's creating a early judgment, for example, as to what advocate did, because we were unable to correct the record. Ms. Treatman, that happens in every case. You can't be talking to both ears of a juror with two different sides at the same time. There's a sequence. So in this case, the plaintiff goes first and then the defense. So that happens in every case. In every case, if the plaintiff goes first, and what you're saying is 50% accurate, some jurors in some cases make up their mind when they hear what the plaintiff said, and nothing that the defense is going to say after that is going to change their mind, then we've got to look at the whole system and say, wait a minute, how are we going to do this better? But right now, this is the system that we have, and every single plaintiff and every single defendant in the civil case has the same sequence. So I'm not seeing how this is a problem. Six of our people that were presented by discovery depositions, and they shouldn't have been, the jury was not allowed to hear the immediate clarification of cross-examination. In any case where you have witnesses in a plaintiff case, we're entitled to cross-examination, so the jury can hear the whole story as they're making up their mind. They didn't hear the whole story here. As to these six people that should not have their discovery depositions read, they only heard snippets that had been juggled around in the discovery deposition. But they had the opportunity two weeks later to hear whatever the defendants wanted to present with regard to these six witnesses. I think that's what Justice Paczynski is saying is because of the way that's presented. Okay, let's say again, the judge should not have allowed in the deposition, but the question becomes one of prejudice. So, you know, your experience of what juries do or don't isn't in the record. What is in the record that would show that the outcome would have been different or that you were prejudiced by what happened here? Well, Your Honor, absent interviewing the jury, I'm not sure we can show prejudice in that respect. And that happens in a lot of appeals where you can't specifically pinpoint that the result would have been different. But if it's highly prejudicial, which we believe it would be, and let's go to a scenario where we have six people that testify during the plaintiff's case in chief that are adverse. And then the judge says, okay, we'll postpone cross-examination for two and a half weeks. I think that would be immediately reversible by this court, even though we'd had the opportunity two and a half weeks later to cross-examine them. That's what we have here. That's the situation. We were not able to clarify or cross-examine or rehabilitate those witnesses who should not have been presented through discovery depositions by some reader. I mean, what the jury heard in the plaintiff's case for the most part was someone reading testimony with no cross-examination. Now, there were three of advocate doctors, four, I believe, McShane, Welch, Dr. Resnick, and Dr. Conley that had their discovery text read. But in those instances, they were employees at the time the depositions were given or we knew they were going to be deposed as opposed to the parent agency findings later. And we're not challenging that. We're the discovery depths which should not have been admitted, period, that they were going to be presented. That's not the test. The test is not they should not have been admitted, period. The test is whether there's been prejudice. No, I understand. You're saying that itself is a prejudice. Like I said, if we were before this court and a judge had instructed counsel for the six adverse witnesses called, you're not going to be able to cross-examine these people for two and a half weeks. You go crazy. What do you mean? Let's talk for a minute about the rules that govern depositions. Every single discovery deposition that is taken, a notice has to be sent out to indicate for what purpose the deposition is going to be taken. And each one of the depositions in this case were sent out with notices that said they were being taken pursuant to the provisions of the Illinois Code of Civil Procedure and the rules of Supreme Court pertaining to the taking of depositions, plural, for the purpose of discovery, right? So when all those depositions were taken, everybody was on the same page. We're taking this under all those rules that in this case, several instances, if you're taking a deposition known as an evidence deposition, that deposition or those depositions would be taken pursuant to the provisions of the Code of the Civil Procedure of the State of Illinois and the rules of the Supreme Court thereof pertaining to the taking of depositions for evidentiary purposes. Why would we have different rules for different types of depositions? What's the difference between the two that can affect how a person is allowed to present or defend a claim? Your Honor, you've stated the reasons, I believe, precisely that we have evidence steps and we have discovery depths. And particularly if the person is available, which in this case they were, then discovery depth shouldn't be used because the notice that was given said it would be for discovery purposes only. If they were going to be taking it as an evidence step, and there were evidence steps of some of the doctors in this case, they had full notice. They were, even if they were available, they were able to give their testimony. And I know there's certain exceptions for doctors. But under Rule 212, where it talks about the use of discovery depths in Section A, and this is, excuse me, Section A5, it talks about the precautions you need to take. There needs to be, as you just said, there needs to be proper notice if you're going to be using it as evidence. It can't be someone who is available, who could be available later. It can't be a control expert witness. And then it says that all this should be done so that substantial justice between or among the parties is accomplished. It's not substantial justice to blindside them later after there's a determination of a parent agency, five years later, four years later after the treatment, and then say, and what you thought was a discovery depth we're now going to be able to use. I think in and of itself, that's prejudice, Justice Simon, when we're talking about going through it, Justice Patensky. And that is not the way we try cases. They should not have allowed to have had their discovery depths read into the record with no cross-examination until two and a half weeks later. Did we have a chance at the end of this trial to get some of that testimony corrected? Yes. Was that proper? It was prejudicial in and of itself to have to have two and a half weeks later to complete some of the testimony and make sure the record's clear as to what was said. Let me ask you just one more question and I'll leave you alone. In your reply brief, you cited a case that I'm quite familiar with, Callaway v. Bovis-Lendleys, that talks about whether statements can be admissible under the rule of evidence 801-D2D, and that's based on whether they were agents at the time they made the statements. Talk to us about that. I think in the context of a hospital, Your Honor, to suggest that somehow because a physician has hospital privileges that therefore that creates a situation that they're in privity or that they've been authorized, which would be part C of that rule, to represent themselves as speaking for the hospital is just absurd. The only time they can do that is when there's been some sort of finding that they had an existing relationship and have dealt with things in the scope of their authority. But there are no cases out there that deal with the privity issue in the context of a hospital. So should this be viewed as a COVID one-off kind of case? You know, just weird stuff happens during COVID? No. Your Honor, I think I've heard of different circumstances where a parent agency comes up and if this case is affirmed, then you're going to have a lot of discovery deaths being read in the record involving taxi cabs and their drivers as independent contractors, insurance companies, independent brokers, employees of parent entities and subsidiaries, realtor companies and brokers. This is just not an those parade of horribles. The only reason it was admitted was because Judge Kirby said that's what the sanctions were meant to do. Without the sanctions, this would never have happened, right? You agree with that? Well, not entirely, Your Honor. And the reason I don't is that Judge Kirby said in his ruling, well, what are the purposes there be for the sanction? Well, the purpose is vicarious liability. They were instructed that they were a parent agency. We're not challenging that. We're just saying, and so we were vicarious liability for their conduct. But then when they come to testify, in order to use discovery depositions, that should not have been part of the sanction. And Judge Donnelly never said the scope of those sanctions. The sanctions have applied to vicarious liability for the conduct that's alleged in the complaint, not their later deposition three or four years later. And that was, and I'm glad you brought that up, Your Honor. If I could, I know my time has probably expired, but Judge Donnelly said, well, then what other purpose would there be for the sanction? Well, it's precisely that. That they are, we're vicariously liable for their conduct. That doesn't mean that when they gave depositions earlier, that somehow we transformed them into our agents at that time. Okay, let's hear from the appellee, Mr. Heath. Thank you very much, Your Honors. Timothy Heath on behalf of the plaintiffs, Joe and Christine the factual basis of the case is essential. In ruling on defendant's post-trial motion, Judge Kirby expressly stated, quote, I watched the jury. I watched them take notes. I watched them pay attention. I believe the jury fulfilled their obligations, but they listened to the evidence that was presented during a lengthy, detailed, fact-focused trial and made a decision based on that, close quotes. Judge Kirby's decision on the post-trial motion that the defendants did not suffer any prejudice from any alleged error can only be overturned based on an abuse of discretion. No such abuse occurred here. Well, what about the arguments that Mr. Eaton has made that the allowing the deposition excerpts to be read by professional actors and no cross-examination permitted and that those individuals weren't even in court until two weeks later? All that indicates prejudice. Okay, Justice Hyman, your question involves a number of different things, and I would like to address them as I can. First off, there weren't any actors, quote. There was a single individual, a retired chemical engineer. He was the only person that did the readings. Second, the fact of the matter is that the statements of a party opponent have been used for a long time. I cited the Galloway case that's from the 1950s in which portions of a deposition of a driver was admitted as part of the evidence against the driver, and so there isn't anything there unusual about the fact that deposition transcripts were used. Justice Lavin talked about the Galloway case. I'm sorry, the first case was Clark. The Galloway case that Justice Lavin talked about involved an individual whose discovery deposition was used at trial. He was a supervisor of the defendant at the time of the deposition, and the allegation was made that it was all chopped up, but the appellate court and the trial court both said the fact that it was chopped up doesn't make any difference. I would also point out in that case also that what the appellate court and the trial court agreed was the evidence that was submitted via those statements was duplicative or cumulative, is the phrase they used, of the evidence that was other evidence that was presented. In this case, we have the classic situation where all six of the apparent agents, not independent contractors, apparent agents of advocate were presented live at trial by both defendants, and what did they testify to? They testified to the same medical records that they had reviewed when they had been deposed in the same evidence was gone over in the defendant's case in chief through those six apparent agents as had been previously discussed in their statements in plaintiff's case in chief. In fact, much of the evidence that came out during the examination actually was better for the depositions. We got better evidence when they actually did testify live. When you were asking before about prejudice, the fact of the matter is that there is no real prejudice here. The defendants have cited a total of four instances in their two briefs of alleged prejudice that occurred. As you pointed out, Justice Hyman, they even concede in their briefs that each instance of those four instances, they were able to, quote unquote, clear it up before the jury started deliberations. The jury heard all of the evidence in this case that was submitted by the parties. They had an opportunity to consider everything that had occurred. In particular, Dr. Stone's Rule 801 D2 statement that was first mentioned in the reply brief, um, his statement was that he had looked at the surgical notes prior to his deposition and he had concluded that Dr. Resnick had taken two weeks to come back to see the patient. The defendants portray this as one of the plaintiff's prime examples of Dr. Resnick's negligence. The defendant's reply brief goes on and suggests that Dr. Stone's narrative was not challenged until Dr. Stone testified live at trial and was shown two of Dr. Resnick's two addendums to resident's procedure notes where Dr. Resnick said he was, quote, present for the procedure, unquote. And they wish this court to presume that the, from their example, that the jury was unaware of the addendum and present for the procedure. However, contrary to the defendant's implication that the plaintiff's withheld something from the jury, before the end of the plaintiff's case, the jury had heard and seen the two addendums, the MICU nursing notes showing who actually was present for the two procedures, as well as what actually was meant by the phrase present for the procedure at least seven times. In total, the jury heard about all of these items approximately 11 times before the start of deliberations. And it first occurred in, uh, the jury first heard about it in plaintiff's opening statement. Plaintiff's heard all about, the jury heard all about that in plaintiff's open statement. Further, while the defendants focus on the phrase present for the procedure, defendants never mentioned in opening statement, closing argument, or even now on appeal, what Dr. Resnick testified that actually meant. What the jury heard at trial was that Dr. Resnick himself took himself out of the room, despite the present for what the present for the procedure implies. Dr. Resnick at his deposition testified that the phrase merely means has to be in the was by Joe's bedside during the procedures. At trial, he, again, on all of his own accord, Resnick testified that as long as I'm within a small timeframe of availability to help the resident if he needs, that's all I need to do. I don't have to sit next to him while he puts in the catheter, close quote. Despite the insinuation that plaintiffs were hiding or trying to hide from the jury, that has no actual basis in fact. Justice Lavin talked about the discovery deposition notices. I agree, the discovery deposition notices do say what was pointed out. However, those same discovery deposition notices were notices that were sent out for Dr. Conley, and for Dr. McShane, and Dr. Welch, and for Dr. Resnick. We were allowed, and we were allowed to under Rule 801 D2 to admit those statements of Dr. Welch, Dr. Conley, Dr. McShane, and Dr. Resnick without objection because those were statements of a party. So they clearly, the fact that it was a discovery deposition doesn't preclude statements from those discovery depositions being admitted at trial, as was recognized by the Illinois Supreme Court in in Ray's state of Renwick, as also is recognized in that Clark case that I talked about in 1950, where the driver had died before the trial, and his discovery deposition statements were used at trial. So that process of submitting the statements of a party has been going on for a long time, and this is nothing new or unusual. The only thing that's different about this case perhaps than most cases is the fact that we had a number of statements of a party opponent from different individuals to introduce to the jury. Now we of course have to address the Rule 801 D2, and the reason why we have to address that is despite what has been suggested about Illinois Supreme Court Rule 212, A5 is not the issue that's involved. It's actually Rule 212 A2, which by the way the Supreme Court specifically changed, I believe in 2018, to specifically refer to Illinois Rule of Evidence 801 D2. And so that, and it changed the language from admission of a party opponent to a statement under Rule 801 D2. So we now turn to what's in... I'm sorry. Okay. We now can turn to what is in Rule 801 D2, and if it's a statement by a party opponent, then of course the declarant does not have to be present or being called live. It doesn't require cross-examination immediately. In fact, Rule 806 is the Rule of Evidence that says that a party against whom a Rule 801 D2 statement has been used can call that person, that declarant, live at trial and can cross-examine them about what their statement was, or commit evidence to impeach the person or reduce their credibility, all without having the witness confronted in the first place. So Rule 806 deals with the issue of cross-examination in that situation. So there is no prejudice for the introduction of Rule 801 D2 statements. Now, one of the other things about Rule 801 D2 to keep in mind is that there are six different bases for which 801 D2 statements can come in, three of which were applicable to this case. In this case, it's C, D, and F. I'll focus first on Rule 801 D2 F. Rule 801 D2 F says that a statement of a declarant is admissible against the party if they are in privity or jointly interested with the party. So what is privity? We look to what the law has been for what is privity. In this type of situation, it is a case called McNamee v. Sandori, which in case involves a hospital who was sued for, and Dr. Sandori was the apparent agent or alleged apparent agent of the hospital in the original lawsuit. The lawsuit against the hospital was dismissed after it being settled, and then the plaintiffs sued Dr. Sandori. Dr. Sandori then claimed that he was in privity with the hospital and that based on res judicata, the case against him should be dismissed. There was two different appeals, but on the second appeal, which is the one that's cited in our case, the court decided that it didn't matter when the issue of parent agency was going to be decided. All that mattered was that if Dr. Sandori was an apparent agent, then he would get the protection of privity from being in privity with the hospital, and so therefore the case against him would have been dismissed. The court left it to be a factual determination to be made in the subsequent case between the plaintiff and Dr. Sandori. Well, let me ask a question because, I mean, all that's in your briefs. The defendants state many times in their opening and closing briefs that the trial was unfair, not a fair trial. So, what's your response? I mean, so your response is, yeah, it was fair, but give me two or three reasons, your major reasons, why it was fair. Okay, so the ways to decide whether it was fair is, one, to look at whether the evidence that they claim was prejudicial actually was cumulative or not. If it's cumulative of other evidence, then by definition it's not prejudicial. Another thing is, the question is, what exactly did those statements actually apply to? And the fact of the matter is, is that the statements of the apparent, and we have to, the court needs to look at what it is that they're complaining about, and we need to be specific for each defendant because it's not the same for Dr. Resnick as it is for Advocate. Dr. Resnick doesn't have any claim under Rule 801 D2 because the statements weren't admitted against him, and so he doesn't have standing to raise a claim that has to do with a statement used against Advocate Hospital. So, and then we also have the problem with respect to Dr. Resnick that he forfeited any claim of prejudice. Why? Because he never made his objection in the trial court that he personally was being prejudiced by any of these statements, and then also because what has the Illinois Supreme Court said the remedy for a co-defendant to say, to use when evidence is being presented against another party? And the answer is, their obligation is to request a never asked for an eliminating instruction at any point in time for any of the six apparent agent statements that were used or any of the three other statements that were used involving Dr. Conley, Dr. McShane, and Dr. Welch. So, as a consequence, Dr. Resnick has forfeited any of his claim of prejudice here, and that's the Bofo versus, I'm drawing a blank on the name, but it's in our brief, the Bofo materials, I believe, case in which said that if you don't ask for limiting instruction, it means that your claim of prejudice is forfeited. So, with respect to Dr. Resnick, also you have the situation where he only complains in his post-trial motion that he was prejudiced by the statements of the doctors who were sanctioned. That would be Dr. Klein, Dr. O'Day, Dr. Harnish, and Dr. Shaw. So, he doesn't include all of the doctors. And so, as a consequence, when you look at what those doctors have to say, they said very little about Dr. Resnick, and in particular, those doctors did not become involved in Dr. Joe's care until February 16th at the earliest. Allegations that we have in our complaint, or I'm sorry, allegations that the jury was instructed on, rather than what was in the complaint, what they were actually instructed on, included allegations against Dr. Conley for his conduct and violating the standard of care on February 12th. That was never addressed in any of the statements that were admitted at trial. We have the allegation against Dr. Resnick about whether he needed to take Dr. Joe to surgery on February 20th. That isn't considered in there. Dr. Resnick, we had an allegation about the fact that he should have asked for a CT scan with oral contrast on the 13th. That all occurred before any of the apparent agencies complaining about statements got involved in his, Joe's treatment. So, consequently, they didn't talk about whether Resnick should or shouldn't do that. And as a consequence, those statements are, those allegations are untainted by the evidence that Dr. Resnick is complaining about. Let me ask you some questions, counsel, about some of the procedures and what happened here. Judge Kirby granted your motion to present the discovery depositions as substantive evidence in lieu of testimony and denied defendants reciprocal motion. Is that correct? Denied defendants reciprocal motion about what? They didn't want it to be allowed. Um, he did deny their motion under that their motion eliminate 37, which only dealt with rule 801 D2D. Okay. Uh, he later acknowledged himself, Judge Kirby, that this was a question of first impression, correct? Um, uh, I think the, what he says in his, uh, uh, post trial motion ruling is he does mention first, uh, uh, a, um, case of first impression, but I think he was referring to the fact that there were sanctions involved and that was part of the reason for his ruling. Well, then I'm glad you brought that because he also said on the record that he disagreed with Judge Donnelly's ruling that plaintiffs established the existence of a legal partnership. Right? Uh, yes. I, but he, but because that was because it was a discovery motion and not a motion to have them found to be a legal partnership. So Judge Donnelly, who was, I guess, a motion judge at that point in time. Yes. Okay. So he came up with the ruling, but then when it came to the trial court, the trial court disagreed with it, but used it to convert these witnesses, uh, discovery depositions effectively into evidence depositions, which are just read to the jury, right? No. Um, uh, Judge Donnelly made the ruling and the sanctions finding that the, uh, advocate had kept records that they, uh, that had, they had been requested to produce that they did not produce them as requested. And what judge Kirby found was a, that advocate did in fact, uh, um, keep records that they should have disclosed. But also what he said was that language in Judge Donnelly's ruling about, um, suggesting that there, he was finding that there was a partnership. Um, Judge Kirby said, no, that's not really what that motion was about. And so he disagreed that there was a finding of a partnership, but there wasn't ever any claim or any ruling by Judge So do you think going forward that parties can, you know, just decide to, uh, uh, use discovery depositions to read a trial instead of presenting the witnesses, you could have presented these witnesses. It's not like they were dead or out of town or anything. Uh, that is true. I could have done that judge, but, um, what I would point out is that under rule 801 D two, I don't have to predict, uh, produce those witnesses live at trial in order to introduce the statements. That's one of the things about rule 801 D two that allows you to do that. And so I didn't have to call Dr. Resnick, for instance, I could, I could have called Dr. Resnick live, but I chose to use his statement that he made in his discovery deposition. Same is true with Dr. Conley and Dr. McShane and Dr. Welch. Those were all. And so, so long as I, the statements comply with one of the sub paragraphs of rule 801 D two, then those statements are admissible and can be used. And there's no requirement under rule 801 D two that the declarant be called. And this is the way you try cases. You read discovery depositions in instead of calling witnesses. I have, I have done that in the past. Yes, judge. And so have other people. Um, and there is no requirement because they're again, the rule of evidence, the rules of evidence are designed by the Illinois Supreme court and they were deliberately chosen, uh, as to what rules are going to apply and how they're going to be written. And so if this Illinois Supreme court wanted the declarant to have to be present at trial in order to admit an 801 D two statement, then the rules would have reflected that they don't. And I would note that this is not the handbook of Illinois evidence by professor Graham talks about the fact that there is no, there doesn't make any sense to have any requirement that the declarant be called live at trial to be cross-examined about a statement that they made themselves. So, uh, in this case, I would point out, Oh, we can't, I can't skip by the part, the lack of preparation. Um, the fact of the matter is, is that by the way, the Illinois Supreme court in Porter versus Decatur specifically found that a hospital is aware of a potential claim against an apparent, as a result of a parent agent, even though that apparent agent wasn't mentioned specifically in the original complaint. And it was only added after the statute of limitations had been brought that up because just to set the record straight, you would agree, wouldn't you, that, uh, the physicians whose discovery depositions were read to the jury became, uh, uh, did not become agents of, they weren't agents at the time they gave for deposition, right? Their finding was later. I'm sorry, your honor, but, uh, it's not an apparent agency. Isn't a question of when the findings made the apparent agency is when the, what's going on at the facts at the time. And that's what the San Dory versus, uh, McNamee versus San Dory case establishes. It, there was no finding in the original case against the hospital that Dr. San Dory was an apparent agent. In fact, that was, so advocate could have, you know, met with these witnesses before their discovery depositions and prep them. Oh yes, your honor. The hospital licensing act, um, was modified as of January 1st of 2004. If you read the, the act itself, it was modified to specifically exempt out, uh, doctors who have not been named as agents or apparent agents. Those people, the doctors who haven't been named in the complaint as agents or apparent agents under the hospital licensing act, the hospital can't meet with them and talk with them. But as recognized in Morgan versus County of Cook back in 1993, um, it was recognized that allegations against an agent, um, of the hospital automatically means that the hospital is in privity or I'm sorry, is the same as the doctor. And so as the consequence, the doc, the hospital and the doctor are not, um, are basically one in the same, I believe is what the court said and said that Petrillo doesn't apply because the hospital has the same protection because it's being accused, uh, of the agent's conduct and said in order for hospital to defend itself, it has to be able to talk to those doctors. Okay. Let's, uh, here's some rebuttal. Uh, thank you, your honor. A couple of things. Uh, counsel's referred to the rules of evidence numerous times, which because of 801 D two D rule one Oh two of the rules of evidence states these rules should be construed to secure fairness in the administration, elimination of unjustifiable expense and delay and promotion of growth and development of the law of evidence to the end that the truth may be ascertained in proceedings justly determined. And it seems to me that if the court in rule two 12 is going to say that if you have 801 D situations, then you have to apply that fairly, which means that it would be prejudicial if you don't. And this did not happen. I think where we'd be seen in cases in the future is and as was this case, not only evidence steps being presented by depositions, which has long been a practice, but now reading discovery gaps, reading medical records, which is also, I mean, this was a reader after a reader after reader, even if it's a neat chemical engineer, it still is a performance. It's not a trial, and that troubles me greatly that this rule would be misapplied in order to allow discovery depths to come in. Um, secondly, with respect to Dr Resnick, Connelly, Welch and McShane, we are not contesting the fact that those discovery depth so called statements or admissions came in because in the case of Resnick and Connelly, they were our employees at the time their depositions were given. Welch and McShane were residents at the time of the treatment and since left, but we presented them because they were our employees at the time. And Justice Lavin, I couldn't agree more with the question that you raised with respect to notice. When you're given notice that something's going to be a discovery depth versus an evidence step, you prepare it differently. And also when you're aware that your doctors are apparent agents at the time, you're going to present them and prepare them differently. And so I think that's the prejudice in this case. And Justice Brzezinski, I don't think I gave the good enough answer to your question. So let me come back a bit about how trials are done typically, in my opinion. Typically in trials, you have an opportunity if a person is called adversely to cross examine them immediately, jury doesn't make up their mind instantly at the time. That is how trials are conducted. But when you have a situation where discovery depths are being read into the record and no opportunity to come back and cross examine or rehabilitate them, that isn't how trials are conducted normally. Particularly when you have in this instance, I think 12 depositions that either by videotape or 10 of which were read, that is prejudicial to the party who goes second. And it's not just because it's a long trial. It's just that impressions get formed because there's no ability to cross examine. And again, my point earlier was it would be, I don't think this court would hesitate to reverse a situation where the trial judge said, oh, I'm sorry, you can't cross that person. I'll give you an opportunity a couple of weeks from now, which is what happened here. Because those discovery depths never should have come in. And assuming that you agree with us on that, the prejudices and having to wait that long to clarify, did they get an opportunity to present that several weeks later? Yes. But at that point, it had been very prejudicial because they were not prepared for statements they'd made earlier. I'd ask you to wrap up, counsel. Yes. So one final point that was raised, Your Honor, with respect to Dr. Resnick, he raised the same issue counsel did before Judge Kirby. And Judge Kirby said he did not believe that Resnick had forfeited any claims. There was no proof during the course of the trial that Resnick was deprived or denied a fair trial. And that he had mentioned that the general verdict would not allow the rule as defendant. I agree with the defense that those arguments do not have merit and they will be dismissed outright. Dr. Resnick and Avika were linked together throughout this entire trial. And Justice Kirby realized that. Judge Kirby, sorry. So we would respectfully ask that this court reverse the verdict and grant the defendants a new trial. Thank you. On behalf of my colleagues, I'd like to thank each of you for your exhaustive presentation and briefing and work on this case, which is truly a case of first impression. We will deliberate and issue an opinion forthwith. We are adjourned. Thank you.